## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| CORTEZ LARNELL MOORE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 3:19-CV-01206-MAB |
| | ) | |
| ILLIOIS DEPARTMENT OF | ) | |
| CORRECTIONS, ET AL., | ) | |
| | ) | |
| Defendants. | | |

### MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

This matter is before the Court on two motions, and supporting memoranda, for summary judgment on the issue of exhaustion of administrative remedies filed by Defendants Wexford Health Sources and Mohammed Siddiqui ("Wexford Defendants") (Docs. 47, 48) and Defendants Baldwin, Burshur, Lashbrook, Lawrence, Macuria, Rose, and Trokey ("IDOC Defendants") (Docs. 51, 52).   Plaintiff filed one response to the motions for summary judgment (Doc. 60), as well as a supplement (Doc. 62). For the reasons set forth below, the motions are **DENIED** (Docs. 47, 51).

### BACKGROUND

Plaintiff filed this civil rights action pursuant to 42 U.S.C. § 1983 on November 4, 2019 for deprivations of his constitutional rights while incarcerated at Menard Correctional Center ("Menard") (Doc. 1, 15). Plaintiff claims that Defendants used excessive force, failed to protect him from said force, and failed to provide him with adequate medical care in violation of the First and Eighth Amendments. After a threshold

review, pursuant to 28 U.S.C. § 1915A, Plaintiff was allowed to proceed on five counts

against Defendants:

**Count 1:** Lieutenant Trokey used excessive force against Plaintiff in violation of the Eighth Amendment;

**Count 2:** Sergeant Macuria, C/O Burshur, John Doe #1, and John Doe #2[1] failed to intervene to stop Lieutenant Trokey's use of force in violation of the Eighth Amendment;

**Count 3:** Lieutenant Trokey, Sergeant Macuria, C/O Burshur, John Doe #1, and John Doe #2 retaliated against Plaintiff in violation of the First Amendment because Plaintiff submitted grievances;

**Count 4:** Lieutenant Trokey, Sergeant Rowes, and Dr. Siddiqui were deliberately indifferent to Plaintiff's need for medical treatment in violation of the Eighth Amendment;

**Count 5:** John Baldwin, Jacqueline Lashbrook, and Wexford had unconstitutional policies of understaffing the healthcare unit, refusing outside care, and cancelling call passes which were in violation of the Eighth Amendment (Doc. 15, pp. 4-5).

Defendants Siddiqui and Wexford filed their motion for summary judgment on

June 11, 2020, arguing that Plaintiff failed to exhaust administrative remedies before filing

this action (Docs. 47, 48). Defendants Lashbrook, Burshur, Lawrence, Macuria, Rose,

Trokey, and Baldwin filed their motion for summary judgment, arguing similarly, on July

1, 2020 (Docs. 51, 52). Plaintiff filed a response to the motions for summary judgment on

September 30, 2020 (Doc. 60, 62).

---

[1] The John Doe Defendants were dismissed on August 3, 2020 (Doc. 54)

An evidentiary hearing, pursuant to *Pavey v. Conley*, 544 F.3d 739 (7th Cir. 2008), was held on January 26, 2021 (Doc. 68). Plaintiff was the only witness who testified at the hearing.[2]

## LEGAL STANDARDS

### *Summary Judgment*

Summary judgment is proper only if the movant shows that there is no genuine issue as to any material fact and they are entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). In making that determination, the court must view the evidence in the light most favorable to, and draw all reasonable inferences in favor of, the nonmoving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted). Courts generally cannot resolve factual disputes on a motion for summary judgment. *E.g., Tolan v. Cotton*, 572 U.S. 650, 656, 134 S. Ct. 1861, 1866, 188 L. Ed. 2d 895 (2014) ("[A] judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.") (internal quotation marks and citation omitted). However, when the motion for summary judgment pertains to a prisoner's failure to exhaust, the Seventh Circuit has instructed courts to conduct an evidentiary hearing and resolve contested issues of fact regarding a prisoner's efforts to exhaust. *Wagoner v. Lemmon*, 778 F.3d 586, 590 (7th Cir. 2015) (citing *Pavey v. Conley*, 544 F.3d 739 (7th Cir. 2008)). *Accord Roberts v. Neal*, 745 F.3d 232, 234 (7th

---

[2] Plaintiff requested that the hearing be postponed, as Lawrence Correctional Center officials would not allow him access to his documents and copies of his response for the hearing due to COVID-19 restrictions. The Court denied Plaintiff's request as the hearing was conducted via Zoom and Defendants could show copies of the documents on the screen for Plaintiff to see.

Cir. 2014).

*Exhaustion*

The Prison Litigation Reform Act provides that a prisoner may not bring a lawsuit about prison conditions unless and until he has exhausted all available administrative remedies. 42 U.S.C. § 1997e(a); *Pavey v. Conley*, 663 F.3d 899, 903 (7th Cir. 2011)). Exhaustion is an affirmative defense, which the defendants bear the burden of proving. *Pavey*, 663 F.3d at 903 (citations omitted).

In order for a prisoner to properly exhaust his or her administrative remedies, the prisoner must "file complaints and appeals in the place, and at the time, the prison's administrative rules require." *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002); *see also Woodford v. Ngo*, 548 U.S. 81, 90 (2006). As an inmate in the IDOC, Plaintiff was required to follow the grievance process outlined in the Illinois Administrative Code. ILL. ADMIN. CODE, tit. 20, § 504.800, *et seq.* (2017). The regulations first require an inmate to attempt to resolve the dispute through his or her counselor. *Id.* at § 504.810(a).[3] If the counselor is unable to resolve the grievance, it is sent to the grievance officer, who reports his or her findings and recommendations in writing to the Chief Administrative Officer (the warden). *Id.* at § 504.830(e). The warden then provides the inmate with a written decision on the grievance. *Id.* If the inmate is not satisfied with the warden's decision, he or she has thirty days to appeal to the Director of the IDOC by sending the grievance to the Administrative Review Board ("ARB"). *Id.* at § 504.850(a). The ARB submits a written

---

[3] There are exceptions to this rule. 20 ILL. ADMIN. CODE § 504.810(a), 504.870 (2017).

report of its findings and recommendations to the Director, who then makes a final determination "within six months after receipt of the appealed grievance, when reasonably feasible under the circumstances." *Id.* at § 504.850(d), (e).

An inmate may also request that a grievance be handled as an emergency by forwarding the grievance directly to the warden. 20 ILL. ADMIN. CODE § 504.840 (2017). If the warden determines that "there is a substantial risk of imminent personal injury or other serious or irreparable harm to the [inmate]," then the grievance is handled on an emergency basis, meaning the warden will expedite processing of the grievance and respond to the inmate, indicating what action shall be or has been taken. *Id.* On the other hand, if the warden determines that the grievance should not be handled on an emergency basis, the inmate is notified in writing that he "may resubmit the grievance as non-emergent, in accordance with the standard grievance process." *Id.*

Though the Seventh Circuit requires strict adherence to the exhaustion requirement, *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006), an inmate is required to exhaust only those administrative remedies that are available to him. 42 U.S.C. § 1997e(a). Administrative remedies become "unavailable" to prisoners when prison officials fail to respond to a properly filed grievance or when prison officials' "affirmative misconduct" thwarts a prisoner from exhausting. *E.g., Lewis v. Washington*, 300 F.3d 829, 833 (7th Cir. 2002); *Dole*, 438 F.3d at 809.

## FACTUAL BACKGROUND

Plaintiff is currently an inmate at Lawrence Correctional Center ("Lawrence") with the Illinois Department of Corrections ("IDOC"); however, he filed this lawsuit for

an incident that occurred while he was housed at Menard (Doc. 15, p. 2). On June 14, 2017, while on the yard at Menard, Plaintiff alleges that Defendant Trokey used excessive force against Plaintiff by placing Plaintiff in handcuffs, cutting off his circulation, and then physically and verbally assaulting him (Doc. 15, p. 2). Plaintiff alleges that Defendant Burshur and Macuria were present, as were other officers (*Id.*). After being assaulted, Plaintiff contends that he continued to attempt to seek medical attention by informing the gallery officer that he needed medical help for a potential concussion (*Id.*). He also states that he asked Defendant Rose for help receiving treatment, but Defendant Rose did not get Plaintiff medication or take him to the health care unit (*Id.*). Plaintiff contends he finally saw Defendant Siddiqui on or around July 28, 2017, who informed him that he was not seen earlier because Menard is understaffed (*Id.*). Plaintiff contends he was prescribed with Ibuprofen, but was not given any other medications or sent for an MRI (*Id.*).

There are two grievances in the record that the parties agree are at issue, dated June 14, 2017 and July 24, 2017, which appear to take different paths throughout the internal grievance system at Menard over the course of the late summer to winter 2017, as outlined below.

## I.      June 14, 2017 Grievance

On June 14, 2017, the same day as the incident, Plaintiff wrote a grievance where he alleged he was assaulted by Defendant Trokey while other officers observed and did nothing to intervene (Doc. 52-1, pp. 12-17; Doc. 60-3, pp. 21-26). Plaintiff's June 14, 2017 grievance is approximately 6 pages long and details that he saw Defendant Trokey

standing near the west yard entrance gate with two other officers. Plaintiff handed Defendant Trokey a grievance related to yard equipment. Plaintiff then went to call his brother when an officer told him that Defendant Trokey was looking for him (Doc. 52-1, p. 13). Plaintiff went to find Defendant Trokey and when he did, Defendant Trokey handcuffed him (*Id.*). After handcuffing Plaintiff, Defendant Trokey shoved him so hard he "almost fell to the ground" (*Id.*). He then started calling Plaintiff racial epithets and threatening Plaintiff while walking him inside the prison (*Id.* at pp. 13-14). Once inside, Defendant Trokey slammed Plaintiff's head so hard against the wall that other officers in the cell house turned to look in their direction (*Id.* at p. 14). Before uncuffing Plaintiff, Defendant Trokey threatened him for filing grievances (*Id.*). Plaintiff details that Defendant Macuria was present and he believes Defendant Burshur was also there (*Id.* at pp. 15-17). Plaintiff also details in this grievance that he began experiencing headaches and was light-headed from this incident, and attempted to see the doctor for these issues, but was only able to see a "paramedic" (*Id.* at p. 17).

Plaintiff testified, and outlined in an affidavit (Doc. 60-2, pp. 3-12), that he made three copies of this June 14, 2017 grievance. It appears from the record that he submitted one version to the Chief Administrative Officer ("CAO") as an emergency grievance requesting an expedited review (Doc. 52-1, p. 12). The grievance was received by the CAO on August 2, 2017 and was deemed a non-emergency grievance on August 4, 2017 (*Id.*). On the face of the grievance, Plaintiff was instructed to submit the grievance in the normal manner (*Id.*).

As for the other two copies, Plaintiff testified that he submitted these copies directly to two Defendants, Warden Lashbrook and Director John Baldwin (Doc. 60-2, p. 4). Plaintiff mailed these grievances on or around June 16, 2017 by placing these documents in his cell bars to be picked up (*Id.*). After twenty days, Plaintiff still had not received a response back, so he contacted the Trust Fund Office to see if money had been removed from his account to pay for the postage of the emergency grievances (*Id.* at p. 5). Plaintiff believes these two emergency grievances were intercepted and/or lost because no money was taken out of his Trust Fund Account (*Id.*). Plaintiff included a copy of this letter attached to both his complaint and response to Defendants' motion for summary judgment (Doc. 60-3, p. 48).

Plaintiff's affidavit details that he wrote a letter to the North Upper Cell House Lieutenant, Mr. Koehn, on July 21, 2017 to follow-up on these missing grievances (Doc. 60-2, p. 6). Plaintiff contends he never heard back from Lieutenant Kohn.

Also on July 21, 2017, Plaintiff wrote two letters to Defendant Lashbrook and Defendant Baldwin. These letters do not appear to be in Defendants' records (Doc. 60-3, p. 4, 60-2, p. 7). Plaintiff details that he sent emergency grievances to both Defendant Lashbrook and Baldwin about the June 14, 2017 incident with Defendant Trokey.  He states he has not received an answer from either Defendant Baldwin or Lashbrook, despite placing these letters in his cell bars on June 16, 2017 (Doc. 60-3, p. 5). He further writes that "many of my grievances have disappeared" (*Id.*). Plaintiff's letter to Defendant

Baldwin is almost identical to his letter to Lashbrook (Doc. 60-3, pp. 11-12; *See generally* Doc. 60-2, pp. 3-6).[4]

## II.    July 24, 2017 Grievance

On July 24, 2017, Plaintiff submitted a second grievance relating to the same assault detailed in his June 14, 2017 grievance (Doc. 52-1, pp. 2-7). Plaintiff testified at the *Pavey* hearing that he submitted this second grievance because he had not heard back from anyone about his June 14, 2017 grievance. Plaintiff's July 24, 2017 grievance is similar to his June 14 grievance, but he elaborates on the June 14, 2017 incident and includes additional complaints about his medical care.

Plaintiff's July 24, 2017 grievance appears to be approximately 10 pages long and details a variety of issues that Plaintiff experienced. He first outlines that he wrote two other grievances (to his June 14, 2017 grievance) about this same June 14, 2017 incident, which have now disappeared. Plaintiff describes placing these grievances in his cell bars to be picked up by (Doc. 52-1, pp. 1-2). Plaintiff states that since he did not know what happened to these grievances, he attempted to check with the Trust Fund Office to see if postage had been taken out to mail these two emergency grievances. Plaintiff received a copy of his Trust Fund account and discovered postage had not been taken out of his funds (*Id.* at p. 3).

---

[4] Plaintiff also includes a letter dated July 31, 2017 that appears to be in response to correspondence from Defendant Lashbrook; however, Defendant Lashbrook's response is not the in the record. Plaintiff states that he will send her affidavits from other inmates "upon your request" who have personal knowledge of the incident Plaintiff described in his emergency grievances dated June 14, 2017 and July 24, 2017. Plaintiff explains he will send these requested documents once he makes copies of them and that is the only reason why he had not provided them sooner (Doc. 60-2, p. 1).

After mentioning the two missing grievances, Plaintiff then summarized the incident with Defendant Trokey, where he attempted to hand him a grievance related to accessing equipment for his recreational time (Doc. 52-1, p. 4). Plaintiff alleged that Defendant Trokey handcuffed him and then shoved him so hard he "almost fell to the ground" (*Id.* at p. 5). Plaintiff outlines that Defendant Trokey then called him racial epithets. Plaintiff details that Defendant Trokey pulled him by his handcuffs into another building where he then shoved him against the wall so violently that other officers and inmates turned to look at them (*Id.* at p. 6). While assaulting him, Defendant Trokey allegedly threatened Plaintiff for filing grievances (*Id.*). Plaintiff details that Defendant Macuria was present as were "a few other officers"(*Id.* at pp. 6-7), and that he had a migraine from the incident that lasted for weeks (*Id* at pp. 9-11). He also states that an Officer Cross and Defendant Rose "were both told about the incident and denied [him] medical attention" (Doc. 51-2, p. 10).

In this July 24, 2017 grievance, Plaintiff describes issues related to his medical care as well. He explains that he was seen by an unidentified nurse on June 16, 2017, where he was given Ibuprofen (Doc. 52-1, p. 11). Plaintiff claims he was feeling lightheaded and had migraines, and attempted to get care for his headaches through sick call passes on June 28, 2017 and July 12, 2017, but was unable to get further examinations of his head or stronger prescriptions for his headaches (*Id.* at pp. 9-11). Plaintiff saw an unidentified doctor on July 28, 2017 and was "feeling better" (Doc. 48-1, p. 37). Still, though, Plaintiff wrote in his grievance that he should have been given stronger medication or an MRI (*Id.*).

Plaintiff submitted the July 24, 2017 grievance to the CAO as an emergency grievance requesting an expedited review (*Id.*). The grievance was received by the CAO on August 2, 2017 and was deemed a non-emergency grievance on August 4, 2017 (*Id.*). Again, Plaintiff was instructed to submit the grievance in the normal manner.

### III.   Timeline of June 14 and July 24, 2017 Grievances After Emergency Review

After Plaintiff submitted these two grievances as emergencies and they were deemed as non-emergencies on August 4, 2017, the grievances took two separate, semi-simultaneous paths. On one path, Plaintiff sent the grievances to his counselor before appealing to the ARB, attempting to submit them in the "normal manner" as instructed by the CAO. On the second path, Plaintiff appealed the two grievances and the CAO's decision, deeming them as non-emergencies, through to the ARB, but without his counselor's response.

### A. Grievances Submitted in the "Normal Manner"—With Counselor's Response

After deeming both grievances non-emergencies on August 4, 2017, Plaintiff then submitted both the June 14 and July 24, 2017 grievances directly to his counselor, Mr. Niepert, on August 12, 2017.   Plaintiff described placing the grievances in the counselor mailbox/grievance box on August 12 to reach his counselor (Doc. 60-4, p. 43). These grievances were not marked as "received," though, until September 5, 2017 (*Id.*).

Plaintiff's counselor simply wrote, "Out of time frame," on Plaintiff's June 14, 2017 grievance, while he wrote, "Duplicate grievance. Issue was grieved previously and deemed out of time. Offender did not file grievance utilizing the proper procedure," on

Plaintiff's July 24, 2017 grievance (*Id.* at pp. 51, 53). There are no copies of these grievances in Defendants' records. Plaintiff's cumulative counseling summary supports that Plaintiff submitted these grievances to his counselor, as there is an entry dated September 5, 2017 where Mr. Niepert writes, "Answered and returned offender's grievances on supposed staff misconduct" (Doc. 52-2, p. 5; 60-4, p. 53). Plaintiff's counselor also wrote, "Duplicate grievance. Issue was grieved previously and deemed out of time frame. Offender did not file grievance utilizing the proper procedure" (Doc. 60-4, p. 53).

The record indicates that Plaintiff continued to attempt to contact his counselor and grievance officers about his grievances. On the same day, presumably after Plaintiff received these responses back from his counselor, Plaintiff wrote Kelly Pierce, Acting Grievance Officer, a letter detailing that he disagreed with his counselor's responses to his June 14 and July 24, 2017 grievances (*Id.* at pp. 56-57). Plaintiff contends that his counselor's response was incorrect because his grievances were not out of the 60-day timeframe (*Id.* at p. 56).

On September 10, 2017, Plaintiff wrote a second letter to Ms. Pierce (*Id.* at p. 60). In this letter, Plaintiff detailed that his counselor's assessment that his second grievance was a "duplicate" was incorrect (*Id.*). Plaintiff goes into detail about the issues previously outlined here in his letter and then asks Ms. Pierce to reject his counselor's response as "being without merit" and deem that "proper investigation measures" were not taken (Doc. 60-4, p. 66). Plaintiff also argues that he did, in fact, file his grievances in a timely manner because he originally filed his emergency grievances well within the 60-day

timeframe ("Both grievances are timely filed as long as they're filed within 60 days of the incident. The Grievance Procedure doesn't say otherwise") (*Id.* at pp. 66-67).

Plaintiff wrote a third letter to Ms. Price on October 24, 2017, requesting to meet with her to discuss his June 14, 2017 and July 24, 2017 grievances since he is "now on [her] caseload again and no longer on Mr. Niepert's caseload" (*Id.* at p. 70). He also asks Ms. Price to forward the grievances to the Grievance Officer (*Id.*). There are no responses from Ms. Price in the record.

On October 30, 2017, Plaintiff's cumulative counseling summary details that the Assistant Warden of Programs' Office/Grievance Office received photocopies of Plaintiff's June 14 and July 24, 2017 grievances (Doc. 52-2, p. 5; 60-2, p. 2). The grievances were returned to Plaintiff because they were not submitted in the timeframe outlined by Department Rule 504 ("DR 504") (*Id.*). Additionally, the grievances were returned because, in accordance with DR 504, copies of grievances are not accepted nor will they be addressed. It is the responsibility of the offender to submit original grievances for processing (*Id.*).[5]

Plaintiff contends that he then sent the original grievances, counselor's response, grievance officer response, and CAO response to the ARB on or around November 9, 2017 (Doc. 60-2, p. 11; Doc. 60-4, p. 40). In that letter, Plaintiff writes that he is responding to the ARB's September 27, 2017 findings (Doc. 60-4, p. 40). Plaintiff describes how he has

---

[5] Although Defendants do not include copies of the grievances submitted on October 30, 2017 in their submissions, Plaintiff's copies of the grievances received on October 30, 2017 are in the record (Doc. 60-4, p. 53). These appear to be the only copies and show that Grievance Office received copies of Plaintiff's grievances *with* his counselor's response because they are stamped as "received" on October 30, 2017.

attempted to exhaust his administrative remedies for this issue by filing both formal and informal grievances and letters (*Id.* at pp. 40-46).

### B.  Grievances Submitted without Counselor's Response

While submitting his grievances in the normal manner, Plaintiff also attempted to appeal the CAO's decision that his two grievances were non-emergencies.

On August 8, 2017, Plaintiff wrote a letter addressed to Defendant John Baldwin and the ARB (Doc. 52-1, pp. 50-54; Doc. 60-5, pp. 6-10). Plaintiff indicated that the purpose of his letter was to appeal the emergency grievance review and/or response from the CAO regarding his original emergency grievance filed on June 14, 2017 (Doc. 52-1, p. 18). Plaintiff details that he sent two copies of his original emergency grievance—one to Defendant Baldwin and one to Defendant Lashbrook—with separate money vouchers on June 16, 2017, two days after the incident (*Id.*). Plaintiff elaborates that because he never received documents back related to his June 14, 2017 emergency grievance, he wrote a second emergency grievance on July 24, 2017 (*Id.*). Plaintiff acknowledged that he received the CAO response on August 7, 2017, which deemed his grievance as a non-emergency and instructed him to submit it in the normal manner (*Id.* at p. 20). Plaintiff ends his letter by asking Defendant Baldwin's help in appealing the CAO's review because he feels that his situation is, in fact, an emergency since he was assaulted by Defendant Trokey in front of other officers that led to physical injuries. He was then made to wait a month to see a doctor to determine whether he had a concussion (*Id.* at p. 21).

On September 5, 2017, the ARB received Plaintiff's appeal of his June 14 and July 24, 2017 grievances (without his counselor's response), along with a copy of his August

8, 2017 letter to Defendant Baldwin and a June 14, 2017 letter to the Health Care Unit asking to be seen by a doctor for a possible concussion (*Id.* at pp. 1, 23). On September 27, 2017, the ARB determined that additional information was required and requested that Plaintiff provide his original grievances including the counselor's response and a copy of the response to his grievances including the Grievance Officer's response and the CAO's response (*Id.*). From the record, Plaintiff included copies of the June 14 and July 24, 2017 grievances, but had not resubmitted them "in the normal way" after being instructed to do that once they were both deemed as non-emergency grievances, as both the July 24, 2017 and June 14, 2017 grievances did not contain his counselor's response (Doc. 48-1, pp. 2, 12; Doc. 52-1, p. 2, 14).

## IV.    Plaintiff's Understanding of the Grievance Process and Additional Records

It is clear from the record that Plaintiff understands the grievance procedure. Plaintiff included an affidavit in which he details the steps he takes to file grievances, including extra steps he engages in because of issues, he alleges, with Menard's grievance procedure. For example, he highlights that the first step is to fill out your grievance and then wait for the counselor's response; however, counselors have developed "a pattern and practice" of holding onto inmates grievances over the allowed time frame so that they can respond by denying the grievance for being untimely filed (Doc. 60-3, pp. 43-44). Plaintiff outlines that this delay happens at every level of appeal (*Id.*). Plaintiff describes that he writes a grievance and then makes three handwritten copies because the law library will not copy the grievances for him (Doc. 60-3, p. 45). He then also attaches a "certificate of service" to the grievance (*Id.*). After, he places the grievances in

the Counselor's box or sends it through the U.S. mail with postage (*Id.*). If the grievance is not responded to within thirty days, Plaintiff contacts the counselor to let them know they have a total of 60 days to respond. If he never receives a response, he notifies the grievance office or the warden about the issue, but if he does receive a reply, he is allowed to make a copy of the grievance in the law library, which he does and then forwards to the warden. Finally, he then appeals to the ARB and if he does not receive a response from the ARB, he writes them a letter requesting information about the status of his grievance and alerting them that according to the Administrative Code, the ARB has six months to reply to a grievance (Doc. 60-3, p. 46). Plaintiff's testimony at the *Pavey* hearing was consistent with this affidavit.

Plaintiff's cumulative counseling summary seems to support that there were issues with Menard's grievance procedures at the time of the July 14, 2017 incident. On November 13, 2017, the Assistant Warden of Programs' Office received a series of grievances from Plaintiff, dated October 3, 2016; August 24, 2016; June 12, 2015; October 12, 2016; October 11, 2016; March 6, 2016; February 25, 2016; February 25, 2016; August 19, 2016; and March 20, 2017 (Doc. 52-2, p. 4). According to Plaintiff's cumulative counseling summary, these grievances were returned the next day after being received "en masse" because they were not submitted in the timeframe outlined in Dept. Rule 504 (*Id.*). At the *Pavey* hearing, IDOC Defendants detailed that each of these grievances have a separate entry in Plaintiff's cumulative counseling summary, indicating when the grievance was originally received on/around the date it was originally written; however,

*none* of these eleven grievances are mentioned in separate entries in the copy of Plaintiff's cumulative counseling summary provided by IDOC Defendants (Doc. 52-2).

To support Plaintiff's arguments, he also included the affidavits of approximately five other inmates who observed the June 14, 2017 incident, witnessed Plaintiff's ailments immediately after the incident, and/or observed Plaintiff placing his June 14, 2017 grievances in the bars of his cell (Doc. 60-3, pp. 50-63). The inmate affidavits are stamped as "received" by the ARB on September 5, 2017, so they appear to have been submitted along with Plaintiff's appeal of the June 16 and July 24, 2017 grievances.

## DISCUSSION

Under the Prison Litigation Reform Act ("PLRA"), all prison inmates bringing an action under 42 U.S.C. §1983 with respect to prison conditions must first exhaust all administrative remedies. *See* 42 U.S.C §1997e (a); *Pavey v. Conley*, 544 F.3d, 739, 740 (7th Cir. 2008). The IDOC Defendants argue that Plaintiff did not exhaust his administrative remedies prior to filing this lawsuit because, essentially, he did not submit his grievances in the appropriate manner by first filing them with his counselor (Doc. 52, pp. 7-10). The Wexford Defendants argue, generally, that both of Plaintiff's grievances do not contain enough information about Plaintiff's issues with his health care treatment to appropriately grieve the issues and they do not include Dr. Siddiqui's name or give enough detail to identify him (Doc. 48, pp. 9-10). Additionally, the Wexford Defendants argue that Plaintiff did not follow the appropriate procedure for his grievances (Doc. 48, pp. 12-14). Both the IDOC Defendants and Wexford Defendants argue that Plaintiff's records indicate he never re-submitted his grievances in the "normal manner" as he was

instructed to do so, which means he did not exhaust appropriately prior to filing this lawsuit (Doc. 48, p. 11; Doc. 52, p. 7). Plaintiff argues in his response, and testified at the *Pavey* hearing that he was, in essence, thwarted from exhausting his administrative remedies. *See Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006) ("Prison officials may not take unfair advantage of the exhaustion requirement, however, and a remedy becomes 'unavailable' if prison employees do not respond to a properly filed grievance or otherwise use affirmative misconduct to prevent a prisoner from exhausting."). In this instance, the Court believes that Defendants have failed to carry their burden and their motions for summary judgment will be denied.

## I.      Plaintiff's Grievances Filed in the "Normal Manner" are Timely

Both sets of Defendants argue that Plaintiff did not submit his grievances in the normal manner, *i.e.* first through his counselor, before submitting them to the ARB. IDOC Defendants attached only two sets of exhibits to their motion for summary judgment: the ARB records and Plaintiff's cumulative counseling summary (Docs. 52-1, 52-2). From these records, it appears they are correct because, "Plaintiff appealed one time to the ARB," and his appeal did not follow proper procedure of including his counselor, grievance officer, and CAO's decision prior to appealing" (Doc. 52, p. 7). Additionally, IDOC Defendants argue there "is no record that Plaintiff resubmitted these grievances in the normal manner" as they cite to his cumulative counseling summary (Doc. 52, p. 7; Doc. 52-2). Wexford Defendants also assert that Plaintiff did not resubmit his grievances "in the normal way," as they are not included in their records either.

However, a review of all the evidence reveals that Plaintiff included copies of his grievances, which demonstrate that he did resubmit them to his counselor (Doc. 60-4, pp. 50-54). These two grievances were denied as being "out of time" and as "duplicates" and returned to Plaintiff. Plaintiff then attempted to move these grievances through the grievance process, sending them to the Warden before ultimately submitting them to the ARB in November 2017 (Docs. 52-2; 60-2, p. 11). Despite arguing otherwise in their motion, the IDOC Defendants acknowledged the existence of these grievances at the *Pavey* hearing and then questioned Plaintiff about why they were not timely filed.

The Illinois Administrative Code states that "a grievance must be filed with a counselor or grievance officer in accordance with the procedures in this Subpart within 60 days after the discovery of the incident, occurrence, or problem that gives rise to the grievance" (Doc. 52, p. 8). As the IDOC Defendants outline, the dates of the alleged incidents in the grievances were June 14, 2017 (describing the alleged attack) and July 24, 2017 (describing the alleged attack and Plaintiff's missing grievances), which means that Plaintiff would have had to submit his grievances to the Grievance Office by August 14, 2017 and September 24, 2017 to be within this 60-day window (Doc. 52, p. 9). Plaintiff argues he submitted both grievances to his counselor on August 12, 2017, which would place both of his grievances within the 60-day window. But these grievances were not marked as "received" until September 5, 2017 by his grievance officer.

The Illinois Administrative Code also allows some exceptions to this 60-day filing deadline. "If an offender can demonstrate that a grievance was not timely filed for *good cause*, the grievance shall be considered" (Doc. 52, pp. 8-9, citing ILL. ADMIN. CODE, tit. 20

§ 504.840(a)). Plaintiff originally filed his grievances as emergencies before he filed them with his counselor, which obviously caused a bit of a delay as he mailed the grievances off to the CAO and then had to wait for a response before submitting them to his counselor. The Court believes this delay could constitute "good cause" within the language of the Administrative Code. Additionally, a counselor's mistaken determination of one grievance as a duplicate of another, when the grievances are obviously different (*e.g.*, Plaintiff's June 14, 2017 grievance is 6 pages long while his July 24, 2017 grievance is 10 pages) could also constitute good cause under the Administrative Code and account for why Plaintiff had some delays in his grievance filing process.

The record reflects that Plaintiff did not simply accept the incorrect finding by his counselor on his two grievances because he appealed to Ms. Price, the warden, and then, ultimately, to the ARB. Writing additional letters to Ms. Price and waiting for responses took additional time, which could account for why Plaintiff did not send his grievances to the warden until October 2017. Additionally, the Administrative Code is clear that administrative remedies become "unavailable" to prisoners when prison officials fail to respond to a properly filed grievance or when prison officials' "affirmative misconduct" thwarts a prisoner from exhausting. *E.g., Lewis v. Washington*, 300 F.3d 829, 833 (7th Cir. 2002); *Dole*, 438 F.3d at 809. A counselor incorrectly categorizing a different grievance as a duplicate seems to be a very fine example of a prison official failing to respond to a properly filed grievance.

Plaintiff also argues that the language of the Administrative Code, itself, is vague as to what this 60-day filing window actually means. For emergency grievances, a

prisoner may file a grievance by going directly to the CAO. *See* ILL. ADMIN. CODE, tit. 20, §504.840. If the CAO determines that the grievance is not an emergency, the prisoner may resubmit the grievance in the normal manner. As Plaintiff argues, this section of the Administrative Code does not outline any timeline for the prisoner's resubmission. Plaintiff filed his emergency grievances in the summer of 2017 and they were received by the CAO on August 2, 2017, well within the 60-day window (Doc. 52-1, p. 12). Plaintiff argues that even though they were returned to him as non-emergencies and he was required to refile them in the normal manner, his first filing was timely. The Administrative Code does not outline that the 60-day clock keeps running for prisoners in Plaintiff's situation, where they are directed to refile their grievances in the normal manner. The Court finds this argument compelling, particularly since Plaintiff has a consistent record of attempting to contact prison officials about these issues both through formal and informal avenues. While Plaintiff's records are consistent, the Court has identified a number of issues with Defendants' records in this instance, which cast doubt on their arguments in their motions for summary judgment.

## II.    Defendants' Records

Defendants' records have a number of inconsistencies. The biggest issue is, obviously, that neither the IDOC nor Wexford Defendants submitted copies of Plaintiff's grievances with his counselor's September 5, 2017 responses (Doc. 60-4, pp. 50-54). Since both sets of Defendants based their motions for summary judgment on the argument that Plaintiff never resubmitted his grievances in the "normal manner," it appears that these

grievances were totally unknown to them ,which casts doubt on the quality of the IDOC's record keeping.[6]

Both sets of Defendants submitted almost identical ARB records and a record of Plaintiff's cumulative counseling summary with their motions for summary judgment (Docs. 48-1; 48-3; 52-1; 52-2). In addition, the Wexford Defendants, not the IDOC Defendants, included Menard's records from when Plaintiff was housed there, which date back to 2016 and include large gaps in Menard's recordkeeping until around 2018 or 2019 (Doc. 48-2). For example, the records include a series of letters Plaintiff wrote on an unrelated issue in the fall of 2016 and then nothing until April 20, 2017 (Doc. 48-2, pp. 42-73). Then, there appears to be a gap in the records for most of 2018 until it includes some of Plaintiff's grievances from 2019 (*Id.* at p. 30).

Another gap in the records occurs in Plaintiff's cumulative counseling summary, which both sets of Defendants submitted into the record. Plaintiff's cumulative counseling summary does not reflect when Plaintiff's emergency grievances were filed or returned to him on or around August 4, 2017 (Doc. 52-2, p. 5). This indicates that either Menard was not keeping track of emergency grievances on cumulative counseling summaries at that time or simply failed to record Plaintiff's emergency grievances on his cumulative counseling summary. Either way, this highlights another significant gap in Defendants' record keeping.

---

[6] Plaintiff also attached these grievances to his Complaint, originally filed on November 4, 2019 (Doc. 1-2, pp. 53-57).

Plaintiff's records are in stark contrast to Defendants' records, as they are extensive and seem to have been kept contemporaneously as issues arose. In addition, Plaintiff's testimony at the *Pavey* hearing was consistent with his documentation dating back to 2017, almost four years ago, even though Plaintiff was not allowed to have his documents in front of him per prison COVID-19 policy. On the whole, Plaintiff's records include fewer gaps than Defendants' records.

### III.     Wexford Defendants — Notice Issue

Lastly, the Wexford Defendants argue that neither the June 14 nor July 24 grievances provided enough notice to Defendant Siddiqui because his name was not included in either grievance, but that argument is unpersuasive. Grievances are intended to give prison officials notice of a problem and a chance to correct it before they are subjected to a lawsuit; grievances are not intended to put an individual defendant on notice of a claim against him. *Jones v. Bock*, 549 U.S. 199, 219 (2007) ("We have identified the benefits of exhaustion to include allowing a prison to address complaints about the program it administers before being subjected to suit . . . . {E]arly notice to those who might later be sued . . . has not been through to be one of the leading purposes of the exhaustion requirement."); *Turley v. Rednour*, 729 F.3d 645, 649 (7th Cir. 2013) ("The exhaustion requirement's primary purpose is to alert the state to the problem and invite corrective action.") (internal quotation marks and alterations omitted; citation omitted); *Johnson v. Johnson,* 385 F.3d 503, 522 (5th Cir. 2004) ("We are mindful that the primary purpose of a grievance is to alert prison officials to a problem, not to provide personal

notice to a particular official that he may be sued; the grievance is not a summons and complaint that initiates adversarial litigation.").

Although the Illinois Administrative Code mandates that grievances include the name, or at least a description, of the persons involved in the complaint, ILL. ADMIN. CODE, tit. 20 § 504.810(c), Plaintiff did just that—he described that medical professionals did not provide him with medical care for the injuries he sustained due to the June 14, 2017 incident. Part of the issue, and perhaps at the heart of the Wexford Defendants' argument, is that it appears that Defendant Siddiqui was possibly not the medical professional who saw Plaintiff for his injuries (*See* Docs. 48-4, 48-5, 48-6). While the Wexford Defendants' exhibits support this argument, these are merits-based arguments more suited for a merits-based motion for summary judgment and not appropriately before the Court on the issue of exhaustion.

## IV.    The Record as a Whole

The Seventh Circuit has made clear, normally the Court does not resolve factual disputes at the summary judgment stage. *See, e.g., Roberts*, 745 F.3d at 234. But when there is a motion for summary judgment as to the issue of exhaustion and a factual dispute remains, that is exactly what the Court must do: weigh the evidence and resolve the dispute. *Wilborn*, 881 F.3d at 1004. At the *Pavey* hearing, Plaintiff's testimony was consistent with his submissions to the Court, despite not having access to his documents for the hearing, and was bolstered by the record. Overall, Plaintiff's testimony was credible, particularly in contrast to Defendants' arguments that ignored a set of grievances that have been in the record since November 4, 2019 (Docs. 1-2, pp. 53-57; 60-

4, pp. 50-54). As a result, the Court concludes based on the totality of the evidence that the grievance process was rendered unavailable to Plaintiff with respect to the June 14 and July 24, 2017 grievances and he is deemed to have exhausted these two grievances. *Dole,*438 F.3d at 809 (7th Cir. 2006) ("Prison officials may not take unfair advantage of the exhaustion requirement, however, and a remedy becomes 'unavailable' if prison employees do not respond to a properly filed grievance or otherwise use affirmative misconduct to prevent a prisoner form exhausting.").

## CONCLUSION

For the aforementioned reasons, the motions for summary judgment on the issue of exhaustion filed by all Defendants (Docs. 47, 51 ) are **DENIED.** This matter shall proceed on Plaintiff's five claims against all Defendants. The stay on merits-based discovery (*see* Doc. 41) is **LIFTED** and the parties can proceed with discovery on the merits of Plaintiff's claims. A new scheduling order will be entered by separate order.

**IT IS SO ORDERED.**

**DATED: January 29, 2021**

s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**